72 So.2d 420

## LIBERTY NAT. LIFE INS. CO.
### v.
### WINFIELD.
### 6 Div. 675.

Court of Appeals of Alabama.

April 27, 1954.

Spain, Gillon, Grooms & Young and Ralph B. Tate, Birmingham, for appellant.

Barber & Barber, Birmingham, for appellee.

PRICE, Judge.

This suit was originally brought in the Intermediate Civil Court of Birmingham, resulting in a judgment for defendant. Upon appeal to the Circuit Court of Jefferson County the case was tried before a jury. Verdict was rendered for plaintiff and defendant appeals.

The complaint consisted of one count, in code form, declaring on a policy of life insurance issued by defendant on May 14, 1951, on the life of Addie M. Winfield The insured died on October 15, 1951.

The policy contained the provision that "This policy shall take effect on its date of issue, provided the insured is then alive and in sound health, but not otherwise."

Defendant interposed pleas of the general issue and of tender, and plea 2, alleging that insured was not in sound health on the date of the issuance of the policy, but on said date she was afflicted with cancer.

It is appellant's insistence that the court erred in refusing the requested affirmative charge because the uncontradicted testimony showed insured was suffering from cancer on the date the policy was issued.

Appellee contends there is no direct testimony in the record regarding the condition of insured's health on or about the date of issue; that Dr. Ray's statements regarding his opinion as to her condition on said date were not based upon "facts such as tests and examinations," but were based upon his "general opinion and general knowledge of the practice" and of his patient's condition a year or more previously. He contends this is also true of Dr. Casey's testimony, in that, his statements were based on averages and generalities and on tests made by him more than a year prior to that date, and the evidence shows no test or examination of insured from April 1950, until her death on October 15, 1951, and at the time the policy was issued she was apparently in normal condition, taking care of her household duties and being a wife to her husband.

The plaintiff, beneficiary under the policy, testified that insured was, on or about May 14, 1951, up and around the house, cooking, cleaning, performing her household duties, caring for her two children, aged 9 and 14, and was a wife to him.

For the defense, Dr. E. C. Ray, insured's family physician, testified that he treated Mrs. Winfield for ulceration, bleeding, irritation and discharge from her female organs for several weeks prior to performing an operation on her. On April 8, 1950, when the ulceration failed to heal, he did what is known as a biopsy—removal of a piece of tissue from the mouth of the womb, which he submitted to Dr. Casey, a pathologist, for a quick observation to determine if there was malignancy present. When Dr. Casey's report was received he did a total hysterectomy, that is, the removal of all of her female organs. These organs were also submitted to Dr. Casey for pathological report. Dr. Ray saw Mrs. Winfield prior to her death on October 15, 1951, and was there every day until she passed away. On the death certificate he showed the immediate cause of death as Lymphatic edema of the left pelvis. He stated there was no doubt in his mind but that Mrs. Winfield died as a result of cancer affecting those organs and further there was no doubt in his mind but that she had cancer at all times between April, 1950, and October, 1951.

On cross examination this witness testified he sent her to Doctors Meadows and Kesmodel as soon after the operation as possible. These doctors treated her with deep therapy and radium. She got along very well for a few months and when this edema began to show up witness started seeing her again and saw her until her death. The edema showed up two or three months prior to her death. She was in pretty good shape in May, 1951, and the first part of that year. He meant by "pretty good shape" that she was doing her house work and up and around. He had been doing her practice for quite awhile and saw her at different times for some minor condition, but didn't remember what. What he had stated with regard to her condition during the whole interim period from April 8, 1950, until the time of her death in October, 1951, was just based on

his general opinion and general knowledge of the practice as it occurred to him.

The record shows the following in this connection:

"Q. Is there any possibility you could be wrong about it? A. Well, we see a lot of these things and of course, we think the deep therapy treatment is what slowed it up. It did give her relief for a few months.

"Q. If you say there was cancer present, it was either arrested or stopped entirely, its progress was, by the deep therapy treatments given to the lady by Doctors Meadows and Kesmodel? A. I think they extended her life quite a few months.

"Q. Would you be willing to say the cancer wasn't entirely arrested, or was entirely arrested, for any period of time during the time when she took the therapy treatments? A. I am going to answer that question that in my opinion it wasn't. She was never free of it if that is what you mean.

"Q. That is your opinion about it? A. Yes, sir.

"Q. Do you make that statement, Doctor, dogmatically? Do you say it would be possible for you to be wrong? A. No, I could be wrong.

"Q. In other words, there is a possibility there may have been—it could have been arrested? A. On the surface the woman looked all right, but from experience we know how that flares back.

"Q. When you say 'flares back,' you mean by that where it has been arrested —the cancer has been arrested and that it comes back again or recurs? A. No, sir, have a metastasis in the other tissues of the body that we can't get to and the only thing we hope to is by deep therapy and radium, give them a while longer.

"Q. But it is possible according to your testimony there might have been a complete cure or a complete arresting of the malignant condition after the deep therapy treatments? A. It is possible, yes, sir. I guess it is possible."

On redirect examination he testified the word "metastasis" means to migrate into other organs.

If a person has cancer, deep therapy or deep X-ray treatment has a tendency to prolong that person's life.

On recross examination the witness testified Mrs. Winfield was a highly nervous woman and on two or three occasions she said to him that Dr. Kesmodel told her, "You are well now and all right," and witness told her he thought so too, because she was an individual who couldn't be told the facts. He did not recall having a conversation with Mr. Winfield about her condition, but if so he definitely didn't tell him his wife was out of danger at any time.

On redirect examination he said what he told Mrs. Winfield was to give her peace of mind.

Dr. Albert E. Casey, a pathologist, testified for the defendant. His testimony was to the effect that his records showed he examined two specimens of tissue from Mrs. Winfield's body on April 8, 1950. The first was a portion of the uterus and he found cancer to be present. The pathological way of grading cancerous tissue is based on the rapidity with which the cancer cells are dividing. If they are dividing rapidly, it is called grade four but if they are dividing with less rapidity they are called grade one or the other grades in between. He graded the first specimen as grade four. That is the grade most likely to be fatal. After Dr. Ray's operation witness made a microscopic examination of the uterus, ovary, fallopian tubes and lymph node. The grade cancer on this was the same as on the biopsy, "with the additional point when the whole uterus was submitted it was found the cancer wasn't only rapidly growing, but had invaded through the wall of the neck of the uterus and had gone through the uterus itself." Sometimes radiation, X-ray and deep therapy is effective and sometimes it isn't. It does have a tendency to prolong life in fatal cancer. It makes a person more comfortable and frequently will prolong life or cure them. As a rule there are very few recoveries by people who are suffering from

grade four cancer. The record also shows the following:

"Q. Doctor, assuming that a person had parts of his body—a lady had parts of her body removed by an operation in April, 1950, and at that time a pathologist determined she had cancer of grade four, and assume further, Doctor, that that same person died on the 15th day of October, 1951, and that the attending physician, at the time of death, gave the cause of death as lymphatic edema of the left hip and pelvis, I will ask you to state to the jury whether or not that person had had cancer from April, 1950, to the date of her death on October 15, 1951? A. Ordinarily, as a pathologist, I think the patient would have had cancer.

"Q. From April, 1950, to October, 1951? A. On an average basis, they would. Without an autopsy I couldn't tell you.

"Q. In the same set of facts, if the examination of the lady's female organs which had been removed in April, 1950, and the pathologist found in that case that the cancer had gone through the cervical wall, I will ask you to state whether or not that would lend weight to your judgment that that person had had cancer during that entire period of time? A. Yes, sir, ordinarily, where cancer spreads through the wall, it is generally considered hopeless from the clinical point of view."

This witness testified on cross examination that he thought there was such a thing as curing grade four cancer. Ordinarily, in grade four cancer between 95 and 100% of the cases are fatal. To the question: "Q. When you make the statement between 95 and 100 per cent of the cases are fatal, you mean by that that somewhere between 95 and 100 per cent, there is five per cent where cure is effected?" He replied: "A. I would say that an occasional patient doesn't die within the five years, but we don't like to use the word 'cure' on cancer." It would be possible for a person to suffer from cancer of the uterus and to be cured of that cancer, and then have cancer come back again in some other portion of the body later on. He

stated on redirect examination this would not be probable, but it is possible. In ordinary cases of cancer of the uterus, of the type he determined Mrs. Winfield had, it is almost 100 per cent fatal.

Plaintiff, in rebuttal, testified that in his dozens of talks with Dr. Ray the doctor never told him his wife had cancer after the deep therapy treatments were given and she had improved so that she could do her work around the house and wait on the children. When he asked the doctor that question his reply was, "We hope she doesn't have it any more" or "I am almost positive she is clear of it."

On cross examination he stated the doctor also told him, "She is as clear as a whistle" or "as clean as a whistle."

■■ It is settled law that a provision in a policy that insured must be alive and in sound health on the date of the issuance of the policy is valid and binding and in legal affect a warranty within the meaning of Section 6, Title 28, Code 1940. Liberty National Life Insurance Co. v. Trammell, 35 Ala.App. 300, 51 So.2d 167. To avoid the policy the unsound health must be such as to increase the risk of loss. Brown-Service Ins. Co. v. Wright, 32 Ala.App. 578, 28 So.2d 318; Life Ins. Co. of Virginia v. Newell, 223 Ala. 401, 137 So. 16; Independent Life Ins. Co. v. Seale, 219 Ala. 197, 121 So. 714.

■ The courts take judicial knowledge that cancer is a disease which materially increases the risk of loss. Miller v. Metropolitan Life Ins. Co., 214 Ala. 4, 106 So. 335; Aetna Life Ins. Co. v. Norfleet, 232 Ala. 599, 169 So. 225; New York Life Ins. Co. v. Horton, 235 Ala. 626, 180 So. 277; New York Life Ins. Co. v. Zivitz, 243 Ala. 379, 10 So.2d 276, 143 A.L.R. 321.

In the case of Grabove v. Mutual Benefit Health & Accident Ass'n, 241 Ala. 88, 1 So.2d 297, 299, Justice Bouldin after observing that while the general rule is that the weight of opinion evidence of expert witnesses is a question for the jury, stated further:

"However, we have held the definite testimony of members of the medical profession, expert in their line, based upon facts within the knowledge and discernment of men of learning and experience, when not in conflict, nor opposed by other evidence, does call for the affirmative charge, with hypothesis. Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755; Aetna Life Ins. Co. v. Norfleet, 232 Ala. 599, 169 So. 225; New York Life Ins. Co. v. Horton, 235 Ala. 626, 180 So. 277; First Nat. Bank of Birmingham v. Equitable Life Assur. Soc. of United States, 225 Ala. 586, 144 So. 451."

In our opinion this case clearly comes within the above stated rule, and for the error of the court in refusing the affirmative charge requested by defendant, the judgment of the circuit court is reversed and the cause remanded.

Reversed and remanded.