**PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant,**

v.

**Alma Mae Long GOURLEY, Appellee.**

No. 17431.

United States Court of Appeals
Fifth Circuit.

May 22, 1959.

Ralph B. Tate, R. Foster Etheredge, Birmingham, Ala., Spain, Gillon & Young, Birmingham, Ala., of counsel, for appellant.

Burgin Hawkins, Birmingham, Ala., for appellee.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

William V. Long was murdered. He was found stabbed to death in his car at 5:00 a.m. June 8, 1957, in his home town of Birmingham, Alabama.

And yet, while this fact does take on some significance later, the sole questions before us arise out of the Alabama law of insurance. The possible criminal aspects have not been entrusted to us—especially as there is neither hint nor clue that the beneficiary was in any way involved.

Long had insured his life for $22,000 with the Prudential Insurance Company. He was divorced, living with his sister, Alma Mae Long Gourley, and had made her the beneficiary. Upon Long's death, Prudential denied liability except as to the $444.63 accumulated premiums and interest. She sued. She won. Prudential appeals.

Prudential has tenaciously clung to one theory throughout its unsuccessful course of initial refusal, defense, motion for new trial, motion for judgment n. o. v., and appeal. It is, quite simply, that Long did not tell the truth when he answered the questions on the application. This defense, it should be noted, is one which finds both statutory support and limitation in the Alabama Code. "No * * * misrepresentation * * * shall defeat or void the policy * * * unless such misrepresentation is made with actual intent to deceive, or unless the matter misrepresented increased the risk of loss." Ala.Code, Tit. 28, § 6 (1940).[1]

Long's medical history is not really the primary source of dispute. There is no hint that his actual cause of death was in anyway related to his past medical history. And it is apparent that some items of that history were misrepresented—at least in the sense of factual inaccuracy. But it is Gourley's contention that they were minor items and misrepresented through inadvertence, forgetfulness or his own good faith belief as to their nonexistence or insignificance, and thus neither "with actual intent to deceive" nor of a nature, as to Long, that "increased the risk of loss."

Long supplied the information for the application to the Prudential examining doctor, Dr. James R. Hodges, on October 4, 1956. The items in issue are the typical ones relating to past history of indications and treatment for heart trouble, and a request to "give complete details" of all past hospital visits, and all consultations with doctors for the past five years.[2] He gave a negative answer to all such questions with the exception

1. Of course, as the standards are expressed in the alternative, it is not necessary that the fact misrepresented qualify under both. "If the misrepresentation is made 'with actual intent to deceive,' then it need not 'increase the risk of loss' in order to be a good defense. If it 'increase the risk of loss,' then it is not necessary that it be 'made with actual intent to deceive.' Of course, both alterna-

tives may exist in the same case, and, if so, they may be averred, but it is not necessary; either is sufficient." Mutual Life Ins. Co. of New York v. Allen, 1911, 174 Ala. 511, 56 So. 568, 570.

2. The questions involved are:

"12. Have you consulted or been attended by a physician or other practitioner for any reason during the past five

of indicating a "plastic operation on nose" in 1954 in answer to question 12. This was, therefore, a misrepresentation and omission of the fact that he had been under the care of Dr. J. L. Hillhouse when in the hospital for pneumonia February 6–9, 1956, and for what was diagnosed to be a coronary occlusion November 18–28, 1952, and at that time electrocardiograms were made. He was also examined by a Naval Reserve doctor, Dr. W. C. Parsons, on August 17, 1953. By all odds the most significant item was the failure to disclose the 1952 hospital admission for a coronary.

### I.  Intent to Deceive

■ The jury's verdict for Gourley required that they find that Long did not make this misrepresentation "with actual intent to deceive." Prudential contends that the District Court erred in its rulings, and in allowing this question to go to the jury, because such a misrepresentation demonstrates an intent to deceive as a matter of law. Of course, before this contention can be meaningfully evaluated it is helpful to examine the record to see the extent to which there was evidence on which the jury could base such a finding.

The jury may have concluded that Long's misrepresentations were due to a permanent forgetting, a temporary inadvertence, a misunderstanding, or if intentional it was without the requisite intent to deceive. Because of his apparent good health and vigor he might have thought that there had been no "indication of any heart * * * disorder." If he remembered the 1952 hospital stay it may have seemed more than five years ago. Such a conclusion, of course, would require that the 1952 occurrence be presumed to be of very little significance to Long. What basis is there

for this belief? In brief, there is (1) the doctors' testimony that Long's occlusion may have been of a very minor degree, (2) Long's subsequent reference to it on one occasion, (3) his general good health, (4) his rather vigorous activity, suggesting both that (a) he must not have considered himself to have had a heart attack, and (b) a reaffirmation of his general condition of good health, and (5) his cause of death.

The medical testimony will be discussed in greater detail later in regard to the "risk of loss" point. It is sufficient to note here that the jury could have reasonably concluded from the testimony that damage from Long's coronary episode was not of a serious location or degree, that medical theory is presently unsettled as to the effect of an occlusion on life expectancy—especially in the case of a coronary of Long's type, and that anyone who carried on activities like Long must have either recovered or not suffered a very serious attack.

Although no one, apart from the medical testimony of his 1952 hospitalization, testified to ever having heard Long complain of the coronary, or shortness of breath or pain, he did report this item in giving a medical history for his nose operation in 1954: *"Possible* coronary occlusion *2–3 years ago."* (Emphasis supplied.) Actually, of course, the occasion was but one year and eight months prior to his 1954 operation. If in July of 1954 he thought the "possible coronary" had occurred as long as three years ago, it is conceivable that two years and three months later (October 1956) he really *considered* it to have been over five years prior to his application, although *in fact* it was but four. And although the five-year period applied expressly only to Question 12, note 2, *supra,*

---

years? Give names, addresses, dates and reasons in 21.

"13. Have you ever been in a hospital, sanitarium or other institution for observation, rest, diagnosis, or treatment?

"14. Have you ever had:

"a. Heart trouble, abnormal blood pressure, shortness of breath, pain in

the chest, rapid pulse, or any indication of any heart or blood vessel disorder?

\* \* \* \* \*

"h. Any X-rays for diagnostic purposes or treatment, or any electrocardiograms, blood or other diagnostic studies?"

the remoteness and uncertainty in Long's mind in point of time are equally relevant in regard to Question 14, note 2, *supra*, in determining the intent which the law requires he have in making this misrepresentation.

Three witnesses testified as to Long's physical activities after 1952. They were Earl Maglinson, the principal of Price Grammar School, Jimmy Tarrant, head football coach Phillips High School, and R. L. Long, Long's brother. Maglinson and Tarrant had been on the coaching staff at Phillips High School with Long from about 1948 to 1956. Long had been head baseball coach and a football coach at Phillips until accepting the principalship of Dupuy School in the fall of 1956, and had remained a Little League baseball coach until the time of his death. They described his general health and physical condition as "stout, strong and vigorous," and "tough." R. L. Long described him as "exceedingly strong physically." As a football and baseball coach he engaged in "rather strenuous and violent exercises." As a coach, according to Maglinson, "You have to block, you have to tackle, you have to run. You have to play football every afternoon." He slid bases for the Little Leaguers, did pick and shovel work on a baseball diamond for them, and had spent nearly all his summers outdoors painting.

Long died four years and seven months after his 1952 hospital admission. During this time there is no record of any further heart trouble. And in assaying this question of intent the jury could also properly consider that the cause of his death was "associated with a penetrating stab wound of the anterior abdominal wall, with perforation of the quadrate lobe of the liver and a massive hemoperitoneum," according to the autopsy post-mortem, and was in no way related to his prior coronary.

The jury presumably considered that this was not the case of a man with a severe and chronic heart condition misrepresenting this fact to an insurance company with the intent to deceive them into issuing him a policy they would otherwise refuse. If this was a factual issue for jury decision, we feel there was adequate basis in the record for this conclusion.

But Prudential asserts that this question of "intent to deceive" should never even have gone to the jury, and that it was wholly one of law. They have cited several cases to us for this proposition. However, none of them are really determinative of the case before us as can be seen from the following brief analysis.

(1) At the outset it may be noted that the cases urged recognize a distinction between insurance application questions calling for an expression of opinion (e. g., "have you ever had * * * any indication of any heart or blood vessel disorder?"), and one merely calling for a statement of fact (e. g., "have you consulted * * * a physician * * * during the past five years?"). Aetna Life Ins. Co. v. Bolding, 5 Cir., (Fla.), 1932, 57 F.2d 626, 627; New York Life Ins. Co. v. McCarthy, 5 Cir. (Ala.), 1927, 22 F.2d 241, 244; McSweeney v. Prudential Ins. Co., 4 Cir., 1942, 128 F.2d 660, 662.[3]

(2) Some of these cases dealt with diseases which the Alabama Courts have ruled "increase the risk of loss" as a matter of law. New York Life Ins. Co. v. Zivitz, 1942, 243 Ala. 379, 10 So.2d 276, 283, 143 A.L.R. 321 ("There are types of fatal maladies of which the courts take judicial knowledge, such as 'tuberculosis, cancer and Hodgkin's disease,' as materially increasing the risk of loss"); New York Life Ins. Co. v. Horton, 1938, 235 Ala. 626, 180 So. 277 (Hodgkin's disease); Miller v. Metropolitan Life Ins. Co., 1925, 214 Ala. 4, 106 So. 335

---

3. "A question ["as to the applicant having consulted a physician for or suffered from a specified ailment or disease"] may call for the opinion or judgment of the applicant upon a debatable matter, as to which the applicant may be honestly mistaken in making his answer." New York Life Ins. Co. v. McCarthy, 5 Cir. (Ala.), 1927, 22 F.2d 241, 244.

(cancer); National Life & Accident Ins. Co. v. Cummings, Ala.App., 1937, 27 Ala. App. 355, 172 So. 353 (tuberculosis). Although it is true, of course, that in an individual case heart disease may increase the risk of loss, Mutual Life Ins. Co. of New York v. Allen, 1911, 174 Ala. 511, 56 So. 568, no cases were cited by counsel nor found by us as holding every coronary episode to do so as a matter of law.

(3) In some cases there was medical testimony that the disease in question was not only fatal but incurable. E. g., Metropolitan Life Ins. Co. v. Dixon, 1933, 226 Ala. 603, 148 So. 121 (Bright's Disease and enlargement of the heart).

(4) In some cases the assured had had quite dramatic evidence of the fact of his disease or illness so that the law considers he had no excuse for having failed to state the true facts then so well known to him. For example, in National Life & Accident Ins. Co. v. Cummings, Ala.App., 1937, 27 Ala.App. 355, 172 So. 353, the insured had suffered a severe hemorrhaging from his lungs about a year prior to his insurance application in which he failed to mention his tuberculosis. And in McSweeney v. Prudential Ins. Co., 4 Cir., 1942, 128 F.2d 660, 661, the insured's brain hemorrhage had resulted in "a numbness of the face, arm and leg on his left side and thickness of the tongue."

(5) Not all statutes require the "intent to deceive" standard and some of the cases have arisen under statutes which only require a "material misrepresentation" though innocent and in good faith. Smith v. John Hancock Mutual Life Ins. Co., 5 Cir., (Ga.), 1957, 249 F.2d 657; New York Life Ins. Co. v. Strudel, 5 Cir., (Fla.), 1957, 243 F.2d 90.

(6) Some of the cases also involve application questions other than those relating to medical care. Smith v. John Hancock Mutual Life Ins. Co., 5 Cir., (Ga.), 1957, 249 F.2d 657 (prior insurance application rejection); National Life & Accident Ins. Co. v. Cummings, Ala.App., 1937, 27 Ala.App., 355, 172 So. 353 (other insurance with same company).

(7) Some cases involved entirely different issues. Claflin v. Commonwealth Ins. Co., 1884, 110 U.S. 81, 3 S.Ct. 507, 28 L.Ed. 76 (removability); New York Life Ins. Co. v. Strudel, 5 Cir. (Fla.), 1957, 243 F.2d 90 (lack of reliance by insuror upon application if makes independent examination); New York Life Ins. Co. v. Zivitz, 1942, 243 Ala. 379, 10 So.2d 276, 143 A.L.R. 321 (responsibility of beneficiary-mother to disclose; application signed by minor-insured-son).

(8) In many instances the insured had been under medical care at the time of his application without disclosing this fact to the company. New York Life Ins. Co. v. Strudel, 5 Cir. (Fla.), 1957, 243 F. 2d 90 ("various doctors;" entered Miami Heart Institute two days after application); McDaniel v. United Ben. Life Ins. Co., 5 Cir. (Ala.), 1941, 117 F.2d 339 (insured was agent of company; abdominal pains, operation week later for enlarged spleen; saw personal doctor day after application); Aetna Life Ins. Co. v. Bolding, 5 Cir. (Fla.), 1932, 57 F.2d 626 (middle of 7-week gall bladder treatment; denied specific inquiry); New York Life Ins. Co. v. Zivitz, 1942, 243 Ala. 379, 10 So.2d 276, 143 A.L.R. 321 (under doctor's care for four years); New York Life Ins. Co. v. Horton, 1938, 235 Ala. 626, 180 So. 277 (under doctor's care for Hodgkin's Disease for two months). And in other cases less time elapsed between the illness or disease and time of application than the four to five years in Long's case. New York Life Ins. Co. v. McCarthy, 5 Cir. (Ala.), 1927, 22 F.2d 241.[4]

4. The standing of the McCarthy case in Alabama has been severely challenged by New York Life Ins. Co. v. Ellis, Ala.App., 1936, 27 Ala.App. 113, 168 So. 200. In that case the Court quoted extensively from the part of the McCarthy opinion requiring the trial court to direct a verdict for the insurance company. The Court then goes on to say, "On the other hand, this court is bound by the decisions of the Supreme Court [of Alabama] upon all questions and on the question here in issue; * * *." 168 So. at page 201. It then adopts this language from Mu-

(consulted "several times" within three years of application); Metropolitan Life Ins. Co. v. Dixon, 1933, 226 Ala. 603, 148 So. 121 (year and one-half); Miller v. Metropolitan Life Ins. Co., 1925, 214 Ala. 4, 106 So. 335 (cancer operation within twelve months); National Life & Accident Ins. Co. v. Cummings, Ala.App., 1937, 27 Ala.App. 355, 172 So. 353 (one year).

(9) Without regard to the extent to which this factor might be determinative, it is interesting to note that often the cause of the insured's death was a result of the very disease or illness which he failed to reveal on the application, often within a very short time thereafter. McDaniel v. United Ben. Life Ins. Co., 5 Cir., (Ala.), 1941, 117 F.2d 339 (five months); McSweeney v. Prudential Ins. Co., 4 Cir., 1952, 128 F.2d 660 (in action to cancel insured died during proceedings); New York Life Ins. Co. v. Horton, 1938, 235 Ala. 626, 180 So. 277 (Hodgkin's Disease); Metropolitan Life Ins. Co. v. Dixon, 1933, 226 Ala. 603, 148 So. 121 (five months later); Miller v. Metropolitan Life Ins. Co., 1925, 214 Ala. 4, 106 So. 335 (cancer).

In brief, we find, after consideration of the above cases and the evidence in the record before us that the facts in Long's case presented a question for the jury as to his misrepresentation of the fact with "an intent to deceive." However we might have decided this question were it put to us, there is adequate record evidence to support the jury's conclusion that Long did not have this intent.

In this analysis and disposition we in no way mean to let the bars down and suggest that all these cases be submitted to the jury. We are bound by and adhere to the Alabama law that recognizes that in some situations the failure to state the truth can be explained in no terms other than a purpose by the assured to deceive. Obviously there are instances in which the nature of the medical condition, its severity in extent, its well known serious effect on life expectancy, its patent relevance to underwriting risks, and the like, leave as the only rational conclusion that the assured purposefully withheld the truth to obtain insurance which would otherwise have been unavailable. Miller v. Metropolitan Life Ins. Co., 1925, 214 Ala. 4, 106 So. 335; National Life & Accident Ins. Co. v. Cummings, Ala.App., 1937, 27 Ala.App. 355, 172 So. 353. But this condition must be established by the record since Alabama likewise declares that, "it is neither the natural nor the necessary effect of such misrepresentation to show intent to deceive * * *; hence the intent * * * required by the statute must be averred, or facts must be alleged from which the intent * * * must necessarily follow." Mutual Life Ins. Co. of New York v. Allen, 1911, 174 Ala. 511, 56 So. 568, 570; New York Life Ins. Co. v. Ellis, Ala. App., 1936, 27 Ala.App. 113, 168 So. 200; Vredenburgh v. Liberty Nat. Life Ins. Co., 1944, 246 Ala. 251, 20 So.2d 207, 211–212.

## II. Risk of Loss

It is important to determine at the outset of this analysis just what the phrase " * * * unless the matter misrepresented increase the risk of loss" means. There are two things which may be said with certainty it does not mean. It does not mean that the matter misrepresented, the omitted illness, must actually shorten the life of the insured.[5] The fact that a man who contracts cancer

---

tual Life Ins. Co. of New York v. Allen, 1911, 174 Ala. 511, 56 So. 568: "[A] mere misrepresentation as to whether the insured has consulted a physician * * is not a sufficient defense unless it is shown that such misrepresentation was made with intent to deceive, or that it increased the risk of loss, as it is neither the natural or necessary effect of such misrepresentation, to show intent to deceive, or increase of risk." (Quoted at 168 So. 201.)

**5.** There was some initial confusion on this point in the Court's charge, which was corrected, and of which neither party now complains. The Court originally charged, "Then if I answered that question, if you say, 'no, we do not believe that he intended to deceive anyone' then

ultimately dies in an automobile accident does not mean that the presence of cancer did not shorten his life expectancy. Moreover, the significant matter is the effect of the *insured's* disease, illness or medical condition on the probable reduction in life expectancy rather than the general classification of that condition. The Supreme Court of Alabama has expressed it this way: "A material risk is any previous affection which might reasonably have been considered a menace to the prolongation of the life of the insured, and that, had it been revealed, the application would have been rejected." Metropolitan Life Ins. Co. v. Dixon, 1933, 226 Ala. 603, 148 So. 121, 122, quoting from, Brotherhood of Railway & Steamship Clerks etc. v. Riggins, 1925, 214 Ala. 79, 107 So. 44, 45.

As to this point, the jury was confronted with the testimony of Drs. J. L. Hillhouse, Albert Casey, Edgar Givhan, and Leon Smelo. The first three were called by Prudential, and the last by Gourley. From their testimony the jury could properly have formulated conclusions somewhat as follows. The medical literature and the averages tend to indicate that men who have suffered a coronary occlusion have a shorter life expectancy than those who have not. However, the medical profession knows surprisingly little about this problem, most of the statistics have been gathered on the basis of rather severe cases, the size and location of the heart damage is of great significance in this regard—although the term "coronary" is applied indiscriminately to the fatal and the near insignificant alike, and there are certainly many persons who have suffered heart damage who go on to live exceptionally long and vigorous lives.

Moreover, once they accepted as factual the history of Long's activities, all the doctors were in substantial agreement—both on the basis of the size and location of Long's scar tissue in the heart and his strenuous activities subsequent to 1952—that he had good functional use of his heart and had either not suffered much damage or had completed an effectual recovery from it.

Dr. Hillhouse testified that although a coronary does impair life expectancy "according to the literature" that "there are different variations" in coronaries, and that a man who was leading a "vigorous, active life" like Long must be "receiving a full, sufficient and adequate blood supply to his heart." He testified that he couldn't tell how this would effect the life expectancy of *Long*.

Dr. Casey testified that although a coronary does reduce "average life expectancy" he "couldn't say in a given individual." He knew of no study of the effect on life expectancy of the type of coronary damage which Long had suffered. This was to the septum (i. e., "merely a wall, a muscle wall which divides these two pumping chambers," according to Dr. Smelo's testimony), an area which Dr. Casey said he would "guess * * * would not" affect the blood circulation. "It is a reserve area. Ordinarily, if the heart gets weak in some of the other areas and you take exercise, it will bulge out and that area is bypassed." And doing the activities which Long was doing, Dr. Casey testified he would be getting adequate circulation, enjoying good health, and not undermining his general health.

Dr. Givhan testified regarding several medical publications [6] setting forth av-

---

you would ask another question, 'Did the coronary occlusion or any of these other matters in the answers, did they shorten his life or not?'" Both counsel agreed that this may have given the jury the wrong impression, so the Court called the jury back in and corrected this phase of his charge. "The second question as I stated it was, 'Did the matter misrepresented shorten the man's life?' I

should have said, 'Did the matter misrepresented shorten Mr. Long's life expectancy.'"

6. The sources relied upon were, Weiss, "Ten-Year Prognosis of Acute Myocardial Infarction," 231 Am.J. of the Med. Sciences 9 (January 1956), Harrison; "The Heart and Blood Vessels and the Kidney: Myocardial Infarction: Epidemiologic Prognostic Study of Pa-

erages indicating that men who had suffered a coronary had thereby decreased their average life expectancy. But he further testified that the severity of the attack in the cases involved (38 cases in one report and 1600 in another) was not known, but that they would probably not be as mild as that which Long had suffered. He, like Dr. Casey, testified that he knew of no statistics as to the effect on life expectancy of a coronary such as Long had. Specifically, as to Long, he testified that he could not predict the effect of Long's coronary upon his life expectancy.

Dr. Smelo testified, "Now the whole field of atherosclerosis and its related coronary heart disease is now undergoing intense investigation and re-evaluation. Many of the ideas that were held when I was in school in 1931 through 1934 just are not accepted any more." He outlined for the jury an excellent elementary statement of the function and operation of the heart and circulatory system. He pointed out that an injury to the septum "would be very much less significant" than, say, one to the heavy muscle wall of the left ventricle. He, too, pointed out the effect of improved diagnostic techniques upon the discovery of milder heart attacks than would have been discoverable earlier, and the fact that presently available statistics were therefore based upon rather severe cases. He concluded that Long "very likely would have an approximately normal life expectancy even though he may have had an injury four and a half years earlier."

There was the additional evidence that Long's medical records from 1952, that of the Naval Reserve Dr. W. C. Parsons August 17, 1953, 1954 (nose operation), and 1956 (insurance examination) all indicated a normal heart to the examining doctors, although, of course, Dr. Givhan testified that a mere stethoscopic examination would not disclose heart damage from the 1952 coronary.

As discussed above, in relation to Long's intent to deceive, the Alabama Courts have not yet held that every coronary occlusion increases the risk of loss to the insurance company as a matter of law. Until Alabama so declares the matter is inherently one of medical fact. As such it was properly one for the jury. Confronted as they were with the evidence we have just discussed, we conclude that the jury could properly find as they did, namely, that Long's particular coronary—whatever more extensive damage might have done—did not decrease probable life expectancy, and thus his misrepresentation did not increase Prudential's "risk of loss."

Affirmed.

HUTCHESON, Chief Judge (dissenting).

While I think the decision is a close one, I concur in the view of the majority that Alabama law, which is controlling here, requires the conclusion that the facts made out a case for the jury upon the question whether under the applicable Alabama statute, Long's misrepresentations of fact were "made with actual intent to deceive". This is so because the answer to the question permitted, in deed required not an objective but a subjective determination, not whether certain facts existed, but the state of mind of the insured with regard to the objective facts. Cf. Equitable Life Assurance Society of United States v. Alvarez, 5 Cir., 141 F.2d 551, a Texas case; Madden v. Metropolitan Life, 5 Cir., 138 F.2d 708, 151 A.L.R. 984, a Florida case.

I cannot, however, concur in the view that whether "the matter misrepresented increased the risk of loss", Ala.Code, Title 28, Sec. 6 (1940) (Mutual Life Ins. Co. of New York v. Allen, 174 Ala. 511, 56 So. 568) also presented a question of fact for the jury's decision. Unlike the answer to the first question, the answer to this one requires an objective answer, that is a determination of what the facts

tients From 5 Departments of Internal Medicine in Oslo 1935–1949," The Year

Book of Medicine 397 (1957–1958 series) ; and Lavigne, Clinical Heart Disease.

are. It does not require, indeed it does not permit a search of insured's mind to obtain a subjective answer, that is the insured's opinion as to whether the admitted facts increased the risk of loss. This means that I cannot agree with the conclusion of the majority that until the Alabama courts declare "that every coronary occlusion increases the risk of loss to the insurance company as a matter of law," the question is inherently one of medical fact. This is not to say that the question whether the matter misrepresented increased the risk of loss is not normally one of objective fact. It is to say, though, that in a case of this kind it is our duty to determine for ourselves whether, as matter of law, the testimony did or did not make out a case for a jury verdict, that is whether reasonable minds could or could not reach the conclusion the jury did, and that our duty to do this is not at all affected by the fact that the Alabama courts, where the scintilla rule applies, have not undertaken to make a generalized holding "that every coronary occlusion increases the risk of loss to the insurance company as a matter of law".

Of the opinion that the evidence on this issue admits of only one reasonable conclusion, that the misrepresented facts did increase the risk of loss, I think the judgment should be reversed and the cause remanded with directions to enter a judgment for defendant. I, therefore, respectfully dissent.