**FEDERAL KEMPER LIFE ASSURANCE COMPANY, Plaintiff-Appellant,**

v.

**The FIRST NATIONAL BANK OF BIRMINGHAM, et al., Defendants-Appellees.**

No. 82–7091.

United States Court of Appeals, Eleventh Circuit.

Aug. 15, 1983.

Ollie L. Blan, Jr., Birmingham, Ala., for plaintiff-appellant.

Alva C. Caine and James O. Haley, Birmingham, Ala., for defendants-appellees.

Before TJOFLAT and VANCE, Circuit Judges, and MORGAN, Senior Circuit Judge.

VANCE, Circuit Judge:

Federal Kemper Life Assurance Company appeals from a jury verdict in favor of the First National Bank of Birmingham and Louise Ray, as executors of the estate of decedent-insured, John Ray. Alabama law governs this diversity case. We affirm.

In October 1979 John Ray applied for life insurance with Federal Kemper in the amount of one million dollars. Ray disclosed in the application that five years previously he had undergone an ileostomy, a surgical procedure disrupting the colon and allowing the intestinal contents to drain into a plastic bag carried outside of the body. If a portion of the colon remains intact, as it did in Ray's case, it is often medically possible to reverse the ileostomy by reconnecting the small intestine with the colon so that bowel contents pass normally through the rectum.

Pursuant to the terms of the policy, Ray scheduled a medical examination with a physician approved by the company. At the examination, Ray fully informed the doctor of his ileostomy. The company's physician did not ask, and Ray did not volunteer, whether Ray was contemplating undergoing the reversal procedure.

Kemper declined to issue the policy in the amount of $1,000,000, but made a counter offer to insure Ray for the amount of $500,-000. Ray, through his secretary, accepted the counter offer, but requested that two policies be issued to him, each in the amount of $250,000. On December 13 Kemper's agent collected from Ray's secretary the payment of premiums on the two policies. The agent informed Kemper of the collection of the premiums, and the company issued two policies dated December 17. Kemper's agent received the policies, lacking only Ray's signature, from Kemper on December 21 and delivered them to Ray's secretary. Ray's secretary arranged to have the forms forwarded to Ray, who at that time was in the hospital.

Unbeknown to Kemper, Ray had entered the hospital on December 9 and had undergone the surgical ileostomy reversal on December 11. After Kemper's agent left the amended policies with Ray's secretary on December 21, one of Ray's business associates took the forms to the hospital and Ray signed them on that day. The forms were subsequently collected by Kemper's agent and sent to the company.

Ray developed peritonitis as a result of the December 11 operation. His treating physician performed a second operation on January 2, 1980, but it was unsuccessful in abating the infection. Ray died on January 16, never having left the hospital after his admission on December 9.

The applications for the policies issued to Ray provided that "the Company shall incur no liability under this application until it has been received and approved, a policy issued and delivered, and the full first premium specified in the policy has actually been paid to and accepted by the Company, *all while the health, habits and any other condition relating to each person proposed for insurance are as described in this application.*" (emphasis added). Kemper contends that the policies never took effect prior to Ray's death because his health and condition changed between the time of application and the time of delivery of the policies. The company contends that Ray breached a duty imposed upon him by Alabama law to advise Kemper of the change in health and that such failure to notify constituted fraud which vitiated the policies. Kemper does not dispute that under Alabama law misrepresentations or failure to notify about changes in medical condition do not void an insurance policy unless they increase the risk of loss assumed by the company or they were made with an actual intent to deceive. The company conceded at oral argument before this court that Ray had no duty to notify Kemper of changes in his condition that did not materially in-

crease the company's risk of loss.[1] We understand Kemper to argue that it was entitled to a directed verdict because the surgical procedure undertaken by Ray increased the company's risk as a matter of law. Kemper asserts in the alternative that even assuming the risk of loss issue was not subject to resolution as a matter of law, the evidence was insufficient to support the jury verdict for the executors of Ray's estate.

## CONTROLLING ALABAMA LAW

[1, 2] The insurance company had the burden of proving that Ray's alleged withholding of material information was done fraudulently with intent to deceive or that it was a material withholding that increased the risk of loss incurred by the company in issuing the policy. Title 28, § 6 of the 1940 Code of Alabama was the statute formerly applicable. It provided that "[n]o written or oral misrepresentation, or warranty therein made, in the negotiation of a contract or policy of insurance, or in the application therefor or proof of loss thereunder, shall defeat or void the policy, or prevent its attaching, unless such misrepresentation is made with actual intent to deceive, or unless the matter misrepresented increase the risk of loss." Alabama courts construing this statutory provision have consistently held that the "rule in Alabama is that to defeat an insurance policy on the ground of misrepresentations in the application it must appear: (1) the misrepresentations were false, (2) made with actual intent to deceive or the matter misrepresented increased the risk of loss and (3) the insurer relied on them to its prejudice." *Bankers Life & Casualty Co. v. Long,* 345 So.2d 1321, 1322–23 (Ala.1977). Kemper contends that a "reasonable assumption *can* be derived from the evidence

in this case [that] Mr. Ray set out to actively conceal from the company" his hospitalization and surgery (emphasis added). The evidence adduced at trial, discussed in more detail below, does not, however, *compel* the conclusion that Ray acted with a deliberate intent to deceive, and Kemper appears not to argue to the contrary. Thus, to avoid the policy, Ray's allegedly unsound health must have increased Kemper's risk of loss. *See National Life & Accident Insurance Co. v. Mixon,* 291 Ala. 467, 282 So.2d 308, 312 (1973); *General Mutual Insurance Co. v. Ginn,* 283 Ala. 470, 218 So.2d 680, 684 (1969); *Liberty National Insurance Co. v. Trammell,* 255 Ala. 1, 51 So.2d 174, 176 (1949); *Sovereign Camp, W.O.W. v. Moore,* 237 Ala. 156, 186 So. 123, 125 (1938); *Life Insurance Co. v. Newell,* 223 Ala. 401, 137 So. 16, 18 (1931); *National Security Insurance Co. v. Tellis,* 39 Ala.App. 455, 104 So.2d 483, 486, *cert. denied,* 267 Ala. 696, 104 So.2d 488 (1958).

Under Title 28 § 6, it is clear that the central inquiry was not whether there was a failure to disclose a material fact; the important inquiry was whether the failure to disclose materially increased the risk of loss assumed by the company, a question for the jury according to Alabama law. This statutory requirement cannot be overridden even by express contractual terms. *General Accident, Fire and Life Assurance Corp. v. Jordan,* 230 Ala. 407, 161 So. 240, 241 (1935).

The Alabama Legislature rewrote Title 28, § 6 in 1971. The relevant section, now codified at § 27–14–7(a) of the 1975 Code, provides:

All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by, or in behalf of, the insured or

---

1.　Q. [By the court]. Are you contending that *coverage is defeated because his condition was not the same, irrespective of knowledge,* or do you contend that coverage was defeated because he did not inform the company of the change?
　A. Both, judge. The policy says there's no liability until those things take place: the policy is issued, delivered and premium ac-

cepted, all while his condition and health is the same.
　Q. Let me take it one step further. Do you contend that he was under any duty to inform the company of a change in condition that did *not* increase its risk?
　A. No, sir. His only duty is to inform the company of conditions that materially change or increase the risk.

annuitant shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:

(1) Fraudulent;

(2) Material either to *the acceptance of the risk or to the hazard assumed* by the insurer; or

(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

(Emphasis added).

Though the Alabama Supreme Court has not yet addressed the issue in detail, it appears that the increased risk of loss requirement remains intact. In *Unionmutual Stock Life Insurance Co. v. Wilkerson*, 367 So.2d 964, 969 (Ala.Civ.App.1978), *cert. denied*, 367 So.2d 971 (Ala.1979), the Alabama Court of Civil Appeals held that "the statute as currently worded embodies [the] same principles" as did its predecessor, Title 28 § 6. The court then proceeded to apply a risk of loss analysis, citing and discussing cases decided under Title 28 § 6 of the 1940 Alabama Code. In its denial of certiorari in *Wilkerson*, the Alabama Supreme Court expressly stated that it agreed with the lower court's opinion. 367 So.2d at 971. *See also American Fire & Casualty Company v. Archie*, 409 So.2d 854, 856 (Ala.Civ.App.1982). We thus conclude that Alabama has not jettisoned its requirement that before misrepresentations may void an insurance policy, those misrepresentations must increase the insurance company's risk of loss.[2]

Kemper contends that Ray's hospitalization and surgery was a condition which as a matter of law increased its risk of loss. We cannot agree. It is true that Alabama courts recognize that there are "some diseases which are commonly known to be of such serious consequences that the court will declare that they increase the risk of loss, without making a jury question." *National Security Insurance Co. v. Tellis*, 104 So. at 486, *quoting Sovereign Camp, W.O.W. v. Harris*, 228 Ala. 417, 153 So. 870, 874 (1934). Alabama courts take judicial notice that certain conditions are commonly known to be life-threatening. *See, e.g., New York Life Insurance Co. v. Zivitz*, 243 Ala. 379, 10 So.2d 276, 283 (1942) (tuberculosis, cancer and Hodgkin's Disease increase risks as matters of law); *New York Life Insurance Co. v. Horton*, 235 Ala. 626, 180 So. 277, 281 (1938); *Liberty National Life Insurance Co. v. Winfield*, 37 Ala.App. 575, 72 So.2d 420, 423 (1954) (cancer). Alabama courts have been reluctant, however, to create broad categories of maladies that increase insurance risk as matters of law and thus that remove the risk of loss issue from the province of the jury. *See, e.g., National Life and Accident Insurance Co. v. Collins*, 244 Ala. 182, 12 So.2d 353, 354 (1943) (syphilis and cirrhosis of liver do not increase risk as matters of law); *Union Mutual Stock Life Insurance Co. v. Wilkerson*, 367 So.2d at 970 (cataracts); *Shinn v. Family Reserve Insurance Co.*, 33 Ala.App. 281, 33 So.2d 741, 742 (1947), *cert. denied*, 250 Ala. 194, 33 So.2d 743 (1948) (pregnancy); *Life Insurance Co. v. Mann*, 28 Ala. App. 425, 186 So. 583 *cert. denied*, 237 Ala. 253, 186 So. 586 (1938) (syphillis). In *Sovereign Camp, W.O.W. v. Moore*, 186 So. at 125, the Alabama Supreme Court explained:

As held in several cases some diseases are so serious as affecting the applicant as an insurance risk that, as matter of law, they are held to increase the risk of loss. Other ailments are so passing and temporary that they could not be materi-

---

**2.** This principle of Alabama law has been sharply criticized by commentators. *See, e.g.,* 1 J. Appleman & J. Appleman, Insurance Law and Practice, § 151 at 448–89 (1982). The wisdom and social utility of the risk of loss concept is, however, a matter for the makers of state policy.

al, and, as matter of law, not the basis of a defense of misrepresentation, under either alternative of our statute.

The disease disclosed by the foregoing evidence [hysteria-neurosis] cannot, as matter of law, be assigned to either of these classes.

Whether this disease increased the risk of loss was a jury question.

■ Thus, in Alabama the issue of whether a particular condition increases the risk of loss assumed by an insurance company is "generally one for the jury." *National Security Insurance Co. v. Tellis,* 104 So.2d at 486, *quoting Harris,* 153 So. at 874. This court's predecessor noted in *Prudential Insurance Co. v. Gourley,* 267 F.2d 156, 162 (5th Cir.1959), that the "significant matter is the effect of the *insured's* disease, illness or medical condition on the probable reduction in life expectancy rather than the general classification of that condition." (Emphasis in original). The Alabama courts "have not yet held that every coronary occlusion increases the risk of loss to the insurance company as a matter of law. Until Alabama so declares the matter is inherently one of medical fact. As such it was properly one for the jury." *Id.* at 163. Similarly, mere hospitalization or surgery has never been held by the Alabama courts to be a condition which as a matter of law increases the risk of loss. As we discuss below, the evidence presented at trial supports the finding that the surgical procedure undertaken by Ray *decreased* that risk in this case.

## SUFFICIENCY OF THE EVIDENCE OF INCREASED RISK OF LOSS

■ Kemper's alternative argument is that even assuming the risk of loss issue was not resolvable as a matter of law, the evidence was insufficient to support the jury's conclusion that Ray's condition did not increase the company's risk; thus the district court should have granted Kemper's motion for directed verdict or judgment notwithstanding the verdict. *See* Fed.R. Civ.P. 50. Although this is a diversity case, the propriety of a directed verdict or j.n.o.v.

is governed by federal law. *New England Merchants National Bank v. Rosenfield,* 679 F.2d 467, 473 (5th Cir.1982) (Unit B), *cert. denied,* —— U.S. ——, 103 S.Ct. 819, 74 L.Ed.2d 1017 (1983); *King v. Ford Motor Co.,* 597 F.2d 436, 439 (5th Cir.1979). The same standard of review is applied by this court as by the district court. *J & H Auto Trim Co. v. Bellefonte Insurance Co.,* 677 F.2d 1365, 1368 (11th Cir.1982). Courts view all of the evidence, together with all logical inferences flowing from the evidence, in the light most favorable to the non-moving party:

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (footnote omitted). *See also Kaye v. Pawnee Construction Co.* 680 F.2d

1360, 1364 (11th Cir.1982); *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1371 (5th Cir.1982) (former fifth circuit en banc).

Applying the *Boeing* standard, the evidence presented at trial is sufficient to support a jury finding that the company knew of Ray's condition and of the possibility of a reconstruction procedure and that it agreed to and did insure against that risk. Dr. Craig Browne, who performed the medical examination of Ray for Kemper prior to issuing the policy, testified that Ray obviously had an ileostomy. Dr. Browne further testified that ileostomies are "relatively common" and that "most people" would desire to have the procedure reversed. Dr. Joaquin Aldrete, Ray's attending physician, testified that many ileostomy patients, between twenty and thirty percent must undergo major surgery for repairs if the reconnection operation is not performed. Before the operation was performed in this case, the doctor explained to Ray that there was approximately a twenty percent chance the procedure would be unsuccessful; in such an event, the ileostomy would simply be replaced. Dr. Aldrete testified that according to the medical literature, there was a three percent mortality rate as a result of the reversal procedure, but that he personally had performed 140 such operations and none of his patients had suffered a major complication. Dr. Aldrete, who is Professor of Surgery and Director of the Division of Gastrointestinal Surgery at the University of Alabama Medical School, also has published a study he conducted of fifty ileostomy cases, none of which encountered postoperative difficulties.

One of Kemper's insurance underwriters testified that there was a "possibility" that Ray would undergo the reversal operation, that he was aware of that fact at the time the policy was issued, that infection could occur if the reversal were not performed, and that not every hospitalization increases the risk of loss. A second underwriter for Kemper testified as follows:

Q. You knew when you agreed to write this policy that there was a possibility that he would be put back in the hospital at some time to have this ileostomy reconnected—you don't reconnect an ileostomy, but you know what I'm talking about, don't you?

A. Yes, sir.

Q To have the operation reversed; *you knew that and you insured that risk, didn't you?*

A. Yes.

Q. You didn't know whether that possibility would be a week, a month or a year or five years hence, did you?

A. That's true.

(Emphasis added.)

Finally, several witnesses who had visited Ray during his stay in the hospital testified about his condition as of late December. Versal Spaulding, the person who actually delivered the policies to Ray in the hospital and who witnessed his execution of the documents, testified that Ray was in "good shape" at that time.[3] Bill Spaulding, who visited Ray during the time in question, testified that Ray seemed normal and alert and that he never saw Ray's stomach distended. Dr. Aldrete testified:

Q. Was his health in substantially the same condition then, those dates through

3. Spaulding testified as follows:

Q. All right, sir. What did you observe Mr. Ray doing that day as far as getting out of bed and signing them, that type of thing, his ability and his functions in the hospital?

A. John was in good shape at that time. He—

Q. What were your personal observations of Mr. Ray on the date that you delivered the policies to the hospital?

A. John was in good spirits and was—as far as I could tell, was in good shape at that time.

Q. What did you observe Mr. Ray doing while you were there in his room? Of course you talked to him; what else?

A. I talked to him, and as I said, he got up out of bed and came to a little stand that was directly adjacent to his bed and signed these forms, and then we visited for a few more minutes, and I left.

Q. Did he get up unassisted by himself and—

A. Yes, sir, he did.

the 21st, as it was on October 22 in your best opinion?

....

A. He could eat, he was having bowel movements, but he was having excessive amount of bowel movements. If that's what you mean by his health—by Mr. Newell:

Q. That's the answer you just corrected, and I'm just trying to compare those two dates; was he in substantially—as of that date, looking at him on the 17th through the 21st, was he in substantially the same health condition as he was on—

A. Well—

Q. —His general health, as of October 21?

A. In general, yes, it was.

■ Thus, the jury reasonably could have concluded that the company issued the policy with knowledge that Ray had an ileostomy, that his rectum was intact, and that a portion of his colon still remained. The evidence suggests that Kemper was aware that persons in Ray's condition were likely at some time to undergo the surgery necessary to remove the ileostomy and restore normal bowel functions. Further, testimony at trial showed that there was a twenty to thirty percent possibility that an ileostomy such as Ray's, if not reversed, could cause complications necessitating major surgery. The company therefore knew when it issued the policies that one of two events was in prospect: either the ileostomy would be reversed or it might result in medical complications. In either event, surgery would be required. The company did not know *when* the further surgery would occur, and no testimony indicated that it was sufficiently concerned about that eventuality to ask Ray about it. The jury was entitled to find that while the reconstruction operation was performed sooner than the company expected, it was performed as expected. The jury could reasonably have rejected Kemper's contention that any surgery, and particularly surgery of this type, increased its risk of loss.

Kemper also raises a series of challenges to the jury instructions given by the district court. We find these contentions without merit.

AFFIRMED.