**Brenda STEPHENS, as representative of the Estate of Mary Louise Downer, deceased, Plaintiff-Appellant,**

**v.**

**The GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, a corporation, Defendant-Appellee.**

No. 83–7562.

United States Court of Appeals, Eleventh Circuit.

Sept. 28, 1984.

* Honorable Edward S. Smith, Circuit Judge, U.S. Court of Appeals for the Federal Circuit, sitting by designation.

Terry Gillis, Joe Kellett, Fort Payne, Ala., for plaintiff-appellant.

James S. Sledge, Gadsden, Ala., for defendant-appellee.

Before HILL and HENDERSON, Circuit Judges, and WISDOM *, Senior Circuit Judge.

ALBERT J. HENDERSON, Circuit Judge:

In this diversity suit governed by Alabama law, Brenda Stephens, administratrix of the estate of Mary Louise Downer, appeals from the grant of summary judgment by the United States District Court for the Northern District of Alabama to the defendant-appellee, Guardian Life Insurance Company of America (Guardian), in an action seeking damages for alleged breach of a medical insurance policy issued by Guardian to Ms. Downer.

On November 15, 1976, Mary Louise Downer, a 45-year-old mill worker, visited Dr. Thomas Pineda in Fort Payne, Alabama, complaining of body weakness and abdominal pain and giving a history of emphysema and ulcers. Dr. Pineda admitted her to the hospital on December 6, 1976, and diagnosed (1) a sliding hiatal hernia (2) emphysema (3) duodenitis and (4) a fibroid uterus. He recommended a hysterectomy but postponed surgery until her chronic breathing difficulty could be evaluated by a specialist to determine if the use of anesthesia would pose any special risk. After Ms. Downer was discharged from the hospital, Dr. Pineda referred her to Dr. Sheldon Kushner, a surgeon in Birmingham, where she could consult a pulmonary specialist. (Pineda deposition 6–22, 27–28).

On February 3, 1977, Dr. Kushner diagnosed a fibroid tumor, emphysema with "fairly severe" pulmonary impairment and excessive coughing without chest pain. He suggested that she see Dr. Marcus Lawrence, who, after an examination, confirmed the findings of Drs. Kushner and Pineda of chronic pulmonary disease and bronchitis. He noted her history of emphysema but added that he could not rule out the possibility of byssinosis, or "mill fever," a chronic industrial disease associated with prolonged inhalation of cotton dust, sometimes complicated by emphysema. He also found that Ms. Downer suffered from first degree AV block, a relatively insignificant, asymptomatic heartbeat irregularity. (Pineda deposition pp. 23–25, Def. Ex. 5) (Lineberry deposition Def. Ex. 4–7). On March 25, 1977, Dr. Kushner performed the total abdominal hysterectomy. The pathology report revealed a benign tumor. (Lineberry deposition, Def. Ex. 4–7).

On February 1, 1980, Ms. Downer secured employment at Hairel's Hosiery in Fort Payne. She did not apply then for hospitalization coverage through her employer's group health insurance plan. (R. 108).

Later that year, on August 27, 1980, she consulted Dr. Giles Bastille, another Fort Payne physician. She gave as history her hysterectomy and ovariectomy in 1977, an allergy to streptomycin and recent "hot flashes" which developed after she had stopped taking hormone tablets in May of 1980. (Bastille deposition at 26). She also complained of vertigo and lower back pain. By her next visit on September 3, 1980, her dizziness had moderated and her pain had disappeared. But two weeks later she became afflicted with a sore throat and coughing. By September 25, 1980 she had overcome both of these ailments, as well as her dizziness.

---

* The Honorable John Minor Wisdom, United States Circuit Judge for the Fifth Circuit, sitting by designation.

The next significant event occurred on March 3, 1981. Ms. Downer applied for hospitalization insurance coverage through her employer's group health insurance plan with Guardian. The application included questions concerning her past and present health. (R. 131).

On March 16, 1981 Ms. Downer complained to Dr. Bastille of aching over her body, headaches and neck pain, exhaustion, a sensation of coldness, coughing accompanied by chest pain, stomach pain, shortness of breath and the illusion of lights or stars. The headaches and neck pain had existed for only two days but the fatigue had been evident for about a month. Dr. Bastille thought the remaining symptoms were "there for about maybe a month, but [he could not] be sure of that." (Bastille deposition 24–25).

Guardian received the application for medical insurance on March 18, 1981. (R. 131). It was approved and went into effect on April 1, 1981.

Dr. Bastille again examined Ms. Downer in the hospital on April 19, 1981. He found a mass in one lung and another in her brain. She was discharged and referred to a Birmingham neurosurgeon, Dr. Clayton Davie. (Bastille deposition at 6–7). Dr. Davie examined her on April 23, 1981 and afterwards made a diagnosis of lung cancer that had spread to five points of her brain. From May 11, 1981 on she was considered a terminal patient. (Bastille deposition 27; Davie deposition 5). Despite the expenditure of more than $22,000.00 in hospitalization, chemotherapy and comfort measures, Ms. Downer died on April 8, 1982.

In response to Ms. Downer's submission of medical and hospitalization claims beginning in May of 1981, Guardian initiated an investigation of her health problem before and after her application for medical insurance. Upon completion of the investigation, Guardian decided to rescind coverage on the ground that Ms. Downer had supplied false answers to health questions in the insurance application. Relying on the testimony of Dr. Stephen Rowe, an expert

on medical insurance, Dr. D.K. Lineberry, who attended Ms. Downer during her terminal illness, and Dr. Bastille, Guardian concluded that she had given false or misleading replies to the following four questions contained in the insurance application concerning her health and medical history:

17. Are you now or do you contemplate receiving medical treatment?

18. Have you consulted a physician or been treated in a hospital within the last five years?

19. To the best of your knowledge and belief, are you now ill?

20. Have you ever had heart trouble, chest pain ... stomach trouble ... tumor or cancer ... or any other injury or health impairment?

In answer to questions 17, 19 and 20, Ms. Downer answered "No." In her reply to question 18, she stated: "Dr. Giles Bastille Fort Payne, Ala. 30967—inner ear infection—anti-biotics cleared up—April of 1980. Dr. Sheldon Kushner East End Hospital Birmingham, Alabama—hysterectomy—no positive signs." Guardian contends that Ms. Downer must have known she was ill on March 3, 1981 when she applied for the insurance because she advised Dr. Bastille on March 16, 1981 that most of her symptoms had been present for about a month. The company also faults her failure to reveal her earlier hospitalization in Fort Payne during which Dr. Pineda diagnosed other ailments, particularly her emphysema. It urges that her negative answer to the inquiry in question 19 with respect to her knowledge of any present illness was likewise misleading based on her complaints to Dr. Bastille on March 16, 1981. Finally, Guardian maintains that Ms. Downer failed to disclose her prior chest pains, stomach problems, uterine tumor and emphysema in her reply to question 20. According to Guardian, had she made known her true medical condition at the time of her application, it would have declined to issue the policy.

In support of its motion for summary judgment, Guardian submitted the deposition of Dr. Rowe, a physician specializing in

insurance medicine and the medical director for a major insurance company. He noted that the emphysema and the ulcers definitely were material to the risk of hospitalization. (Rowe deposition 45). The appellant does not dispute the materiality of these conditions. Dr. Rowe further testified that the ulcer and emphysema so increased the risk of hospitalization that, had he been an underwriter for Guardian and known these facts, he would not have recommended coverage. (Rowe deposition 44–46).

Dr. Rowe added that upon reading Ms. Downer's somewhat bald description of her hysterectomy he, as an underwriter, would have asked for proof of diagnosis and a pathology report. Appellant's counsel followed up this remark during his cross-examination.

Q. I believe you mentioned that if you'd had this application and seen this reference to a hysterectomy and no positive signs, you would have requested to see the medical records before you would have decided whether or not to issue the policy.
A. I would have asked for an ... attending physician's statement .... This gives you a lot of information that kind of opens up Pandora's Box.

. . . .

Q. As a matter of fact, most of the things that you've talked about in this case were in Dr. Kushner's notes, weren't they?
A. Yes.

. . . .

Q. [I]n this case you would have written Dr. Kushner and the hospital to find out what had gone on.
A. You can then grab the string. If I see that name of Sheldon Kushner, East End Hospital, Birmingham, Alabama, and a date, I've got all I need. I can take that string and start pulling it out. It opens up a lot of information.

Q. And you would have found these things that you said in your opinion should have been revealed on there?
A. Yes, sir.
(Rowe deposition 33, 47–49).

The complaint was originally filed in the Circuit Court of DeKalb County in February, 1982 but subsequently was removed by Guardian to the United States District Court for the Northern District of Alabama pursuant to the provisions of 28 U.S.C. § 1441 (1976). Guardian filed its motion for summary judgment on September 8, 1983, which motion was granted by the district court on September 12, 1983. This appeal followed.

The standard of review of a district court's grant of summary judgment is whether the evidence, when viewed in the light most favorable to the non-moving party, presents no genuine issue of material fact and entitles the moving party to judgment as a matter of law.

■ Alabama insurance law deals harshly[1] with health insurance applicants who fail to supply insurers with accurate and complete medical histories. In pertinent part, Ala.Code § 27–14–7 (1975) provides:

All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by, or in behalf of, the insured or annuitant shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:

(1) Fraudulent;
(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate

---

1. This circuit has noted commentators' sharp criticism of the statute but added, "The wisdom and social utility of the [Alabama insurance law] is, however, a matter for the makers of state policy." *Federal Kemper Life Assurance Co. v. First National Bank,* 712 F.2d 459, 463 n. 2 (11th Cir.1983).

as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise. As noted by the Alabama Supreme Court, § 27-14-7 furnishes three separate grounds for the rescission of a policy.[2] The most innocent misrepresentation will afford a reason to rescind if the truth is either material to the risk or, even if immaterial, would have caused the particular insurer acting in good faith to have declined coverage in the amount and at the rate obtained by the applicant. On occasion Alabama courts have held certain diseases material to the risk as a matter of law,[3] but materiality is more commonly treated as a question of fact. *E.g., Union-mutual Stock Life Insurance Co. v. Wilkerson*, 367 So.2d 964, 968 (Ala.Civ.App.), *cert. denied*, 367 So.2d 971 (1979).[4] This court has similarly considered materiality in this context as a question of fact. *Dempsey v. Auto Owners Insurance Co.*, 717 F.2d 556 (11th Cir.1983); *Lumbermen's Mutual Casualty Co. v. Myrick*, 596 F.2d 1313, 1315 (5th Cir.1979); *Prudential Insurance Co. v. Gourley*, 267 F.2d 156, 162 (5th Cir.1958).[5]

Alabama's common law, however, alleviates the severity of § 27–14–7 by recognizing a widely adopted[6] exception that "the policy is not avoided if the insurer knows the true facts, or the falsity of the statements, or has sufficient indications that would put a prudent person on notice so as to induce an inquiry which, if done with reasonable thoroughness, would reveal the truth." *Bankers Life & Casualty Co. v. Long*, 345 So.2d 1321, 1323 (Ala.1977), (citing *New York Life Insurance Co. v. Strudel*, 243 F.2d 90 (5th Cir.1957)). Whether the particular information disclosed to an insurer would have prompted a reasonably prudent insurance company to investigate an applicant is an issue for the jury. *Inglish v. United Services General Life Co.*, 394 So.2d 960, 966 (Ala.Civ.App.1980); *New York Life Insurance Co. v. Zivitz*, 243 Ala. 379, 10 So.2d 276 (1942). *Accord, First Pennsylvania B & T Co. v. United States Life Insurance Co.*, 421 F.2d 959, 964 (3d Cir.1969); *Adriaenssens v. Allstate Insurance Co.*, 258 F.2d 888, 891 (10th Cir.1958); G. Couch, 7 Cyclopedia of Insurance Law, § 35:269 (1981). Once the insurer has come within the protection of § 27–14–7 by showing a misrepresentation, the insured must prove not only that the circumstances would have prompted a reasonable insurer to investigate but also that a reasonable inquiry would have uncovered the misrepresentation. Thus, where an insurer, suspecting an applicant of having heart disease, required two medical exams and interviewed the applicant's friends, neighbors and personal physician before issuing the policy, the company was permitted to rescind coverage after the insured died from heart disease. *New York Life Insurance Co. v. Strudel*, 243 F.2d 90, 92–94 (5th

---

**2.** *National Sav. Life Insurance Co. v. Dutton*, 419 So.2d 1357 (Ala.1982) (overruling in part and without citation *Inglish v. United Services General Life Co.*, 394 So.2d 960 (Ala.1980)); *New York Life Insurance Co. v. Horton*, 235 Ala. 626, 630, 180 So. 277, 280–81 (1938) (construing the statutory ancestor of § 27–14–7).

**3.** *E.g., New York Life Insurance Co. v. Zivitz*, 243 Ala. 379, 10 So.2d 276, 283 (1942) ("There are types of fatal maladies of which the courts take judicial knowledge, such as 'tuberculosis, cancer and Hodgkin's disease,' as materially increasing the risk of loss."); *Horton*, 235 Ala. 626, 180 So. 277, 281 (1938).

**4.** The Alabama Supreme Court in applying the statutory predecessor of § 27–14–7 also regarded the issue of material risk as one of fact. *E.g., Sovereign Camp W.O.W. v. Moore*, 237 Ala. 156, 186 So. 123, 125 (1938).

**5.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

**6.** *See* J. Appleman and J. Appleman, 16B Insurance Law and Practice, § 9086, p. 547 (1981); G. Couch, 7 Cyclopedia of Insurance Law 2d, § 35:251, 252 (1961); R. Keeton, Insurance Law—Basic Text, § 5.7 (1971).

Cir.1957) (construing the exception in the context of Florida's rescission provision).

In this case, the appellant did not produce any evidence contradicting the testimony by several physicians that Ms. Downer's emphysema and ulcers constituted serious health problems, physical infirmities she had mentioned to some of her doctors. Especially persuasive is testimony by Dr. Rowe, an expert on medical insurance, that emphysema and ulcer are conditions highly relevant to the risk of hospitalization. The appellant simply argued, despite considerable testimony to the permanence of emphysema, that by 1981 Ms. Downer had overcome her earlier pulmonary difficulty. Even so, the insurance application plainly requested information about her past as well as present medical history, and Ms. Downer knew she had at least been afflicted with emphysema and ulcers. Consequently, there is no disputed fact issue with respect to the application of § 27–14–7(a)(2), and as a matter of Alabama law Guardian has established a statutory right to rescind its policy.

Nonetheless, there remains a material controversy as to whether Guardian was put on notice to inquire further as required by Alabama common law. Guardian's own witness, Dr. Rowe, flatly stated that Ms. Downer's reference to her hysterectomy would have aroused his suspicions and prompted him to contact Dr. Kushner. Dr. Rowe's testimony in this regard appears to be uncontradicted. Guardian failed to make any investigation, much less a reasonable one. Had it made a reasonable inquiry, it almost certainly would have contacted Dr. Kushner, who very probably would have furnished the information it now says should have been disclosed by Ms. Downer. Therefore, if Ms. Downer's answer to question 18 was sufficient to put Guardian on notice to inquire further, it would be charged with knowledge of all the medical conditions she failed to reveal.

The leading Alabama case on notice to the insurer focuses on the close similarity between the insured's disclosed and undisclosed diseases. *Bankers Life and Casualty Co. v. Long*, 345 So.2d 1321 (Ala.1977). In *Long* the applicant had reported a six-month hospital visit for hepatitis, a liver condition. Since his discharge, Long's liver function tests showed his liver to be normal. He failed to report that his hospitalization produced a diagnosis of cirrhosis, alcoholic hepatitis and alcoholism as well. He had visited the hospital three times in the six-month period, but only for a total of three months. All his diseases, noted the Alabama Supreme Court, resulted from the same malady—alcoholism. The court held that disclosure of Long's hospitalization, although mistakenly overstated, as well as his hepatitis and the name and address of his physician put the insurer on notice to conduct a further investigation. A likely though unexpressed rationale for this conclusion is that a layman, acting in good faith, ought not to be expected to complete an insurance application with the same medical precision as a physician. Of course, Ms. Downer's case varies somewhat because she plainly believed she had had certain diseases that she described to her physicians.

An instructive companion case to *Long* decided two years earlier refused to impose a duty of inquiry on the insurer. *Herricks v. Mutual Life Insurance Co. of New York*, 294 Ala. 446, 318 So.2d 683 (1975). Herricks had reported simply that he had once had a "Co. exam" for heart trouble by a certain named physician in Birmingham. Had the insurer probed further, the physician would have revealed the applicant's cirrhosis of the liver. The court explained that nothing on the application indicated Herricks was an alcoholic. In fact, he had specifically answered "No" to a question asking if he had alcoholism or a drug habit. In short, what Herricks disclosed—an apparently routine company exam—was not nearly so serious as Long's intermittent six-month hospitalization. Insurers are not required to investigate when the information furnished by the insured reveals nothing out of the ordinary. The Alabama court of appeals has held persuasively that the mere mention of an address where

medical records can be obtained is not enough to put an insurer under a duty to inquire, absent other suspicious aspects of the application. *Inglish v. United Services General Life,* 394 So.2d 960 (Ala.Civ.App. 1980). On the other hand, knowledge of the cancellation of an applicant's earlier policy with another company does put the second insurer on notice. *Reliance Insurance Co. v. Substation Products Co.,* 404 So.2d 598, 602–04 (Ala.1981) (fire insurance). Cases in other jurisdictions analyze the issue of notice in various insurance situations, but none are sufficiently analogous to be of particular help here.[7]

We can find no case in Alabama or elsewhere which evaluates the weight of expert testimony in a situation such as presented here, but so long as Dr. Rowe's statement is uncontradicted, Guardian is not entitled to a judgment as a matter of law. There remains an issue of material fact as to whether Guardian had a duty to inquire under the particular circumstances of this case. The district court erred in granting summary judgment on this question.

The judgment of the district court is REVERSED and REMANDED for further proceedings consistent with this opinion.

---

7. For cases placing insurer on notice, *see First Pennsylvania Banking & Trust Co. v. United States Life Insurance Co.,* 421 F.2d 959 (3d Cir. 1969); *Union Insurance Exchange v. Gaul,* 393 F.2d 151 (7th Cir.1968) (earlier cancellation of insurance); *Franklin Life Insurance Co. v. Bieniek,* 312 F.2d 365 (3d Cir.1962) (suspiciously unresponsive answer on application); *Columbian National Life Insurance Co. v. Rodgers,* 116 F.2d 705 (10th Cir.1941) (negative evaluation by prior insurer).

Other cases holding no duty of additional investigation is required are *Adriaenssens v. All-* *state Insurance Co.* 258 F.2d 888 (10th Cir.1958) (no absolute obligation to check with Department of Public Safety before issuing auto insurance, absent a suspicious application); *New York Life Insurance Co. v. Strudel,* 243 F.2d 90 (5th Cir.1957) (no inconsistencies or ambiguities in application answers); *Provident Life & Accident Insurance Co. v. Hawley,* 123 F.2d 479 (4th Cir.1941) (inconsistencies unrelated to and less important than the undisclosed abnormal heart condition); *Jefferson Standard Life Insurance Co. v. Stevenson,* 70 F.2d 72 (5th Cir.1934) (very minor inconsistency).