800 P.2d 37

**CENTRUST MORTGAGE CORPORATION, a California corporation, Plaintiff/Appellant/Cross–Appellee,**

v.

**PMI MORTGAGE INSURANCE CO., an Arizona corporation, Defendant/Appellee/Cross–Appellant.**

**PMI MORTGAGE INSURANCE CORPORATION, an Arizona corporation, Plaintiff/Appellee/Cross–Appellant,**

v.

**CENTRUST MORTGAGE CORPORATION, a California corporation, Defendant/Appellant/Cross–Appellee.**

**No. 2 CA–CV 90–0105.**

Court of Appeals of Arizona, Division 2, Department B.

Oct. 25, 1990.

Lewis and Roca by Andrew S. Gordon,
Susan M. Freeman, Karen Carter Owens

and Rosemarie Christofolo, Phoenix, for plaintiff/appellant/cross-appellee.

Meyer, Hendricks, Victor, Osborn & Maledon by Larry A. Hammond, David G. Campbell, W. Scott Bales and Andrew D. Hurwitz, Phoenix, for defendant/appellee/cross-appellant.

## OPINION

FERNANDEZ, Chief Judge.

This case was tried to the court sitting without a jury for 27 days. At issue is appellee/cross-appellant PMI Mortgage Insurance Company's rescission of 63 mortgage insurance policies after appellant/cross-appellee CenTrust Mortgage Corporation filed claims on many of the policies. The trial court made numerous findings of fact and conclusions of law. This court must view the evidence "in the light most favorable to sustaining the findings." *Imperial Litho/Graphics v. M.J. Enterprises*, 152 Ariz. 68, 72, 730 P.2d 245, 249 (App.1986).

In 1981, three general partners formed the Par 34 Partnership to develop a condominium project. The partnership bought an apartment complex, converted it to condominiums to sell to investors, and approached CenTrust, a mortgage lender, about financing the project. The developers contemplated that each investor would purchase one to three units. In June 1981, CenTrust and the partnership entered into a written loan commitment in which Cen-Trust agreed to make mortgage loans on the 154 units in the complex. The commitment provided that each buyer would make a cash down payment of at least 10% of the purchase price. The loans CenTrust agreed to make were amortized over 30 years but were due in three. The interest rates were adjustable every three months, and the commitment agreement permitted the sellers to buy the interest rate down 3%.

After it entered into the loan commitment, CenTrust sought mortgage insurance from PMI Mortgage Insurance Company to insure the loans to Par 34 buyers. CenTrust provided PMI a copy of the loan commitment agreement, together with a project appraisal and a project approval form CenTrust had filled out. After one of PMI's employees inspected the property, PMI approved the project.

CenTrust submitted the first loans to PMI for insurance coverage in October 1981. The evidence was that once a project has been approved for insurance, the lender submits a loan package of documents to the insurance company for approval of each individual transaction. The insurance company reviews the documents to check the loan-to-value ratio, the purchase price, the appraised value, the down payment, and the presence of other financing and other concessions, as well as the ability and the willingness of the borrower to repay the loan. The insurance company conducts no independent investigation of the borrower and generally informs the lender whether it will insure the loan within 24 hours after it receives the documents. Consistent with that process, called review underwriting, CenTrust provided PMI with the industry-standard documents for each loan, including a loan application, an appraisal, and a transmittal summary that showed the loan amount, sales price, appraised value, interest rate, loan terms, and loan-to-value ratio. Based on those documents, PMI agreed to insure three loans on October 26, 1981. The documents, together with an industry-standard affidavit of purchaser and vendor that PMI required to be submitted, stated that the purchase price of each condominium was $67,000, the down payment was $7,850, and there was no secondary financing.

Two days after PMI agreed to insure the first three loans, the regional vice-president and office manager of CenTrust's Phoenix office met with the principals of Par 34 and representatives of the escrow company. As a result of the meeting, new escrow settlement documents were created. These documents implemented a Canadian tax concept known as multi-unit residential building (MURB), which the developers had not previously used in the United States. In a traditional real estate transaction, the buyer makes a down payment and borrows the remainder of the purchase price from

the lender. Any financing fees and closing costs that the buyer is required to pay are paid in addition to the down payment. The MURB concept utilized by the Par 34 developers differs radically from the traditional transaction. Under MURB, the buyer purportedly pays the financing fees and closing costs with the same money he or she uses to make the down payment so that the money is double counted in the transaction. The buyer receives increased tax benefits as a result.

In addition to the MURB concept, the developers introduced another feature unique to the Par 34 transactions. Because the rental income expected to be received from the units was less than the mortgage payments, the developers planned to deposit $5,000 from the proceeds of each condominium sale to an account with CenTrust to cover the resulting negative cash flow. CenTrust was to withdraw funds monthly from the account to meet the mortgage payments. The fund was to be replenished monthly by the rental payments. The project's sales brochure characterized the $5,000 deposit as a three-year interest-free loan. In actuality, however, rather than being paid by the sellers from the sales proceeds, the deposit was deducted from the buyer's down payment and from CenTrust's loan proceeds. Thus, it was tantamount to a $5,000 rebate on the purchase price. The fund was depleted within three months because no rental income was deposited into it. In September 1982, the developers forgave all the escrow fund loans.

Under the new escrow settlement documents created in October 1981, the various financing fees and closing costs on each loan, including more than $8,600 in fees charged by CenTrust, totalled nearly $18,000. The buyer paid $7,850 as a cash "down payment," and the balance was paid from the loan proceeds of $59,150. This diversion of funds conferred tax benefits on the buyers, but it also, in effect, eliminated the down payment and reduced the price the buyers actually paid for the condominiums.

When the new documents were created, the developers' attorney became concerned because the payment by the buyers of all fees and costs from the down payment and loan proceeds resulted in a loan-to-value ratio that exceeded that required by the loan commitment agreement. He was concerned that the provision would cause CenTrust not to fund the loans. When he broached the subject to CenTrust's office manager, however, he was told not to worry about it.

The loan commitment agreement upon which PMI had already approved the Par 34 project said nothing about the MURB concept or the $5,000 loan. The agreement provided that all closing costs would be paid by the purchasers, but the applicable provision does not state that those costs were to be paid from the down payment and the loan proceeds. There was no indication that the traditional method for payment of costs would not be followed. The provision on the escrow fund account states that the developers "and/or Purchasers" shall maintain a savings account to provide for automatic loan payments. There is no mention that the funds placed in the account would be characterized as interest-free loans or that those loans would be funded from CenTrust's loan proceeds. Moreover, the loan commitment agreement specifically provided that "[n]o secondary financing will be allowed." When the new escrow settlement documents were created, CenTrust did not send copies of them to PMI. CenTrust also did not send PMI a copy of a November 4, 1981 letter from the developers to CenTrust that formally amended the loan commitment agreement to reflect the fact that all closing costs would be paid from the down payment and loan proceeds.

After 123 units had been sold, an internal auditor for CenTrust concluded that the transactions violated the loan commitment agreement because the resulting loan-to-value ratio exceeded 100% and the purchasers had no actual equity in the units. She demanded that new documents be prepared, including a new purchase contract that required the sellers to pay closing costs and financing fees. The developers,

however, told the CenTrust office manager that the document difficulties were his problem, and the partnership continued to advise purchasers that the closing costs and financing fees were tax deductible. PMI was told none of this nor sent any of the revised documents.

The remaining 31 units became impossible to sell, perhaps because of the change in the purchase contract. Because the expected partnership profit was to be realized from the sale of the last 30 units, the developers sold them to friends who acted as "straw buyers" in exchange for a fee of $2,500. The persons selected had good credit histories, applied for loans from Cen-Trust, and made the down payment with funds provided by the Par 34 Partnership. The buyers then walked away from the properties, and the partnership made initial payments on the loans.

By May 1982, PMI had issued insurance on 63 loans, the bulk of them in November and December 1981 and January 1982. Of the 63 loans, PMI later learned that 51 were MURB transactions that included the $5,000 loan. The other 12 were straw transactions in which the down payment was paid by the partnership. By the time of trial, 62 of the loans had defaulted.

CenTrust filed its first claim with PMI in April 1984. PMI commenced an extensive investigation and, on April 2, 1985, rescinded the policies on all 63 units and returned the premiums it had received. Both parties filed lawsuits in July 1985. PMI sought a declaratory judgment that its rescission was proper, and CenTrust alleged that the rescission was a breach of contract. The cases were consolidated shortly after they commenced.

The trial court made the following findings about the customs and practices of the mortgage lending/mortgage insurance business:

A. The mortgage lending and mortgage insurance business is built upon a relationship of trust.

B. Mortgage insurers have a right to expect, and do expect, that mortgage lenders will fully and fairly disclose material terms of transactions, particularly where the transaction is an unusual or unique one as was the case with the Par 34 transaction.

C. Mortgage lenders are able to gather many more facts from many more sources than mortgage insurance companies.

D. Mortgage lenders expect mortgage insurers to conduct 'review underwriting' in which they review the underwriting documents provided by the lenders, and to provide prompt responses to underwriting requests, usually within 24 hours.

E. The mortgage insurance project approval process is a search for relevant information about a subject property and mortgage insurers regularly rely upon mortgage lenders to provide such information.

F. It is not unusual or imprudent for a mortgage insurer to rely upon information provided to it by a mortgage lender during the project approval process.

G. Mortgage insurance companies do waive requirements for the receipt of documents in the underwriting process based upon assurances provided by the mortgage lender.

The court found that PMI's approval of the project and its commitment to issue insurance were not unreasonable or imprudent based upon the information CenTrust had supplied to PMI. In addition, the court found that because the MURB concept was unique and unusual, CenTrust had a duty to explain its features and effects to PMI. It also found that CenTrust had not communicated to PMI the key terms of the MURB concept and that it had affirmatively misrepresented the terms of the transaction on the standardized documents it had submitted to PMI in the review underwriting process. The court found that the MURB concept had the effect of reducing the down payment to less than 5%.

With regard to the $5,000 loans, the court found that the loan commitment agreement did not disclose their existence, that a reasonably prudent mortgage insurance company could not reasonably have been expected to discover the existence of

the loans or the negative cash flow arrangement in the face of CenTrust's representations in each underwriting file that no other financing was involved and that there were no unusual rebates, concessions, or credits. The court found that the $5,000 loans had the effect of reducing the down payment in each transaction to less than 5% and that the loans constituted a credit to the purchasers. The court also found that the 12 straw transactions violated PMI's policy provision. CenTrust was found to have misrepresented the purchase price of the units to be $67,000 when, in fact, it was approximately $52,000. CenTrust was also found to have misrepresented the loan-to-value ratio and the existence of a down payment. The court found that all the misrepresentations were material to the insurance transactions and that they resulted in the lender's violation of the insurance policy requirements.

Based on CenTrust's misrepresentations and omissions, as well as its breaches of contract, the court concluded that PMI was entitled to rescind coverage on the policies. PMI was also awarded substantial attorney's fees and costs pursuant to A.R.S. § 12–341.01.

On appeal, CenTrust contends that the trial court erred in 1) finding that a mortgage lender has a duty to disclose unrequested information to the mortgage insurer, arguing that PMI was on inquiry notice of the true facts and that it failed to inquire; 2) permitting PMI to obtain rescission on grounds that it untimely raised, arguing that PMI waived additional grounds; 3) finding that CenTrust misrepresented the purchase price and the down payment; and 4) finding that CenTrust made misrepresentations about the straw transactions. In its cross-appeal, PMI contends that the court erred in not allowing it to recover certain costs. We affirm.

## DUTY TO DISCLOSE

■ The court approved rescission of the policies on the basis of legal fraud,

concluding that rescission was justified by PMI's insurance policy provision invalidating the policy for any transaction in which the borrower did not make an actual down payment of at least 5%. Under Arizona common law, an insurance company can rescind a policy if the insured makes misrepresentations and the misrepresentations are material to the risk insured. *Modern Woodmen of America v. Stevens*, 70 Ariz. 232, 219 P.2d 322 (1950); *Continental Casualty Co. v. Mulligan*, 10 Ariz.App. 491, 460 P.2d 27 (1969).[1] Legal fraud occurs when an insured incorrectly states a fact about which he has actual knowledge or that is presumed to be within his knowledge. *Id.* Intent to deceive need not be shown. *Id.*

According to PMI's expert, mortgage insurance began with the creation of the Federal Housing Administration. After World War II, the Veterans Administration also began to insure lenders against default on residential loans. Those agencies conduct their own underwriting and appraisal on loans. Because the savings and loan industry found the agencies' procedures too cumbersome, time consuming, and duplicative, the private mortgage insurance industry developed in the late 1950's. Under the private system, the lender conducts the extensive underwriting process, and the insurer relies on the results of the lender's investigation in deciding whether to insure the loan. Because this type of insurance is relatively new, the court made extensive findings as to the industry's customs and practices. We have reviewed those findings and find support for them in the record.

■ The trial court expressly found that CenTrust affirmatively misrepresented six aspects of the transaction to PMI: the amount of the purchase price, the existence of a down payment, the loan-to-value ratio, the absence of secondary financing, the

**1.** The legal fraud doctrine, codified in A.R.S. § 20–1109, adds a third requirement, that the insurer in good faith would not have issued the policy if it had known the true facts. That requirement does not apply to this case because

the trial court found that the policies were not issued in Arizona. *See* A.R.S. § 20–1101. The court also found, however, that PMI would have been entitled to rescind under § 20–1109 in any event because the third requirement was met.

granting of special concessions or rebates to the buyers, and the fact that the purchasers in the straw transactions made no down payment at all. Unlike the oral misrepresentations in *Foremost Guaranty Corp. v. Meritor Savings Bank*, 910 F.2d 118 (4th Cir.1990), that were contradicted by statements in the documents possessed by the mortgage insurers, CenTrust's misrepresentations were written and were contained in the documents it provided PMI. The true facts did not appear in those documents. All the misrepresentations were material and all, in one way or another, affected PMI's policy requirement that the down payment be at least 5%.[2] The violation of that policy provision warrants PMI's rescission of the policies in question.

CenTrust does not contest the court's findings as to the factual grounds for PMI's rescission. Instead, it disputes the court's conclusions and argues that PMI was on "inquiry notice" of the existence of both the MURB concept and the $5,000 loans and that, at the time of underwriting, PMI either knew or should have known everything about the transactions upon which it now bases its claim for rescission.

█ As CenTrust has pointed out, the "widely adopted" rule is that an insurer cannot rescind a policy because of an insured's misrepresentations if the insurer knows the true facts "or has sufficient indications that would put a prudent person on notice so as to induce an inquiry which, if done with reasonable thoroughness, would reveal the truth." *Stephens v. Guardian Life Insurance Co.*, 742 F.2d 1329, 1333 (11th Cir.1984). *See also Foremost Guaranty Corp., supra.* As CenTrust has also pointed out, Arizona follows the rule of inquiry notice. *Greber v. Equitable Life Assurance Society*, 43 Ariz. 1, 28 P.2d 817 (1934); *Chicago Fire & Marine Insurance Co. v. Sharpensteen*, 37 Ariz. 132, 289 P. 985 (1930). We agree, therefore, that PMI was on inquiry notice about the actual facts of the transaction.

█ The rule, however, requires that the facts be such as to " 'put a reasonably prudent man on inquiry.' " *Id.* at 141, 289 P. at 989, *quoting Huestess v. South Atlantic Life Insurance Co.*, 88 S.C. 31, 35, 70 S.E. 403, 406 (1911). Whether the information disclosed to the insurer is such as to have caused a reasonably prudent insurer to investigate further is a fact question. *Stephens, supra.* In this case, the court found that it was not unreasonable or imprudent for PMI to approve the project based on the information CenTrust had supplied it. CenTrust argues, however, that because PMI knew that the condominiums were to be purchased by investors who might purchase more than one unit, PMI was on notice that the loans were high risk. That fact, however, does not serve to put PMI on notice that CenTrust was affirmatively misrepresenting the purchase price, the down payment, and the loan-to-value ratio and concealing the MURB concept and the $5,000 negative cash flow loan. PMI's expert testified that it was the MURB concept and the $5,000 loans that caused 62 of the 63 loans PMI insured to default, not the investor-owned nature of the project.

CenTrust also argues that a provision in its June 8, 1981 commitment letter put PMI on inquiry notice of the negative cash flow arrangement. We disagree. As we noted earlier, that provision speaks only in terms of the developers and/or purchasers maintaining a savings account to provide for mortgage payments. There is no mention of an interest-free loan to be funded from the loan proceeds, which created, in effect, a rebate on the purchase price.

CenTrust also contends that a single sentence in the amended purchase contract should have put PMI on notice of the entire MURB arrangement. CenTrust, however, asked PMI to insure the loans before the purchase contract was even drafted. PMI agreed to insure the loans based on other documents CenTrust provided, each of which failed to disclose the MURB concept and each of which also affirmatively mis-

---

**2.** Pursuant to A.R.S. § 20–1541(1), PMI is forbidden from insuring a loan with a loan-to-value ratio greater than 95%.

represented the terms of the transactions. After the purchase contract was drafted, CenTrust failed to provide a copy of it to PMI. The one purchasing contract found in PMI's files involved a sale that closed January 13, 1982 after PMI had insured 35 to 38 of the 63 loans in question, at a time when the project approval phase was long past and when PMI was conducting 24–hour turnaround review underwriting and relying on the affidavit of purchaser and vendor.

PMI's expert testified that purchase contracts are used in mortgage insurance underwriting only to corroborate information found on the standardized loan application. He also testified that the affidavit of purchaser and vendor, in which the vendor verifies under oath the essential terms of the loan transaction, can also serve to corroborate that information. PMI conditioned its issuance of coverage upon receipt of such affidavits from CenTrust and did, in fact, receive them. Those affidavits continued the misrepresentations as to the purchase price, the amount of the down payment, and the absence of secondary financing. The court found that PMI was not unreasonable in insuring the loans conditioned on receipt of the affidavits. We find no merit to CenTrust's contention that one sentence in one contract submitted months after the transactions had commenced put PMI on inquiry notice of the MURB concept.

In addition, CenTrust argues that PMI should have learned of the MURB concept from the Par 34 marketing materials and an accounting letter. The difficulty with that argument is that CenTrust failed to present any evidence that PMI received those materials. Indeed, the evidence was that CenTrust itself never had copies of the marketing materials.

 Finally, CenTrust contends that neither the MURB concept nor the $5,000 loan was material to the transaction. A fact is material if it "might have influenced a reasonable insurer in deciding whether to accept or reject the risk." *Central National Life Insurance Co. v. Peterson,* 23 Ariz. App. 4, 7, 529 P.2d 1213, 1216 (1975). The trial court found that the misrepresentations CenTrust made about both MURB and the loans were material. We find sufficient evidence in the record to support that finding.

Even if PMI is held to the duty of inquiry notice, therefore, we agree with the trial court that PMI, as a reasonably prudent insurer, could not reasonably have been expected to discover the true nature of the transaction from the facts before it.

## WAIVER OF RIGHT TO RESCIND

CenTrust next contends that PMI waived all grounds for rescission other than the reason stated in its April 2, 1985 rescission letter, that the $5,000 undisclosed loan reduced the down payment to less than the 5% required by the policy. It argues that the trial court erred in finding that, at the time PMI wrote the letter, it lacked sufficient knowledge to determine whether to waive the right to rescind on other grounds.

In April 1984, nearly two years after it had issued the last policy, PMI received three notices of delinquency on the Par 34 loans. PMI undertook an investigation of the project and interviewed one of the developers, several investors, and two real estate agents who were then attempting to sell a number of the condominiums. None of those individuals disclosed the existence of the MURB concept, the $5,000 loans, or the straw transactions.

Between June 15, 1984 and October 3, 1984, PMI wrote eight letters to CenTrust asking for documents about the transactions. CenTrust either ignored the letters or sent documents that had not been requested. On October 19, 1984, a PMI employee attended a Par 34 homeowners' association meeting and learned for the first time that the developers had provided each buyer with $5,000 to cover the expected negative cash flow. PMI then made additional requests for documents about the $5,000 loans. CenTrust again either ignored the requests or provided only incomplete information. Investigators employed by PMI finally confirmed the existence of

the loans in January 1985. In March 1985, CenTrust wrote PMI that it had no role in the $5,000 loans except to act as the depository for the funds. The letter said nothing about either the MURB concept or the use of straw buyers.

Based on the information in PMI's possession, it rescinded coverage on the loans in April 1985. The letter said nothing about MURB or the straw transactions because PMI did not know about them at the time.

"A waiver is either an express, voluntary, intentional relinquishment of a known right or such conduct as warrants inference of such intentional relinquishment." *DeTemple v. Southern Insurance Co.*, 154 Ariz. 79, 82, 740 P.2d 500, 503 (App.1987). *See also McCollum v. Continental Casualty Co.*, 151 Ariz. 492, 728 P.2d 1242 (App. 1986). CenTrust bore the burden of proving that PMI had waived other grounds for rescission. *Jerger v. Rubin*, 106 Ariz. 114, 471 P.2d 726 (1970). That burden requires "[a] clear showing of intent to waive," with doubtful cases to be decided against waiver. *Goglia v. Bodnar*, 156 Ariz. 12, 19, 749 P.2d 921, 928 (App.1987).

We find evidence to support the court's finding that at the time it sent its rescission letter, PMI lacked sufficient knowledge to determine whether it waived its right to contest the policies on other grounds. In addition, we believe the argument is meritless in view of the fact that the trial court concluded that PMI was justified in rescinding on the ground stated in its rescission letter.

## CORRECTNESS OF PURCHASE PRICE FINDING

CenTrust claims that the court erred in finding that the purchase price of the condominiums was actually $52,000 and not the $67,000 figure that CenTrust represented to PMI. Conflicting expert testimony was presented to the court on that issue. The trial court resolved the conflict in favor of PMI. We find no error.

## STRAW TRANSACTIONS

Finally, CenTrust contends that the trial court erred in finding that CenTrust had misrepresented the 12 PMI insured loans that were straw transactions, arguing that there was no evidence that any of its employees knew or should have known about the transactions. There was, however, testimony that CenTrust's Phoenix office manager had reason to suspect the straw transactions and should have investigated them.

The court ruled, in applying the policy requirement of a minimum 5% down payment, that it was not relevant whether CenTrust participated in or knew or should have known of the scheme that resulted in the inadequate down payment. We believe the correct statement of the law is that the policy provision is violated if the insured knew or should have known of the straw transactions scheme. PMI produced evidence that CenTrust's office manager participated in a straw transaction himself, although it was not one of the transactions at issue. Therefore, the record supports the trial court's conclusion that the straw transactions also violated the insurance policy requirement of a minimum 5% down payment.

## CROSS–APPEAL

The court awarded PMI attorney's fees of $680,510.55 and taxable costs of $35,005.84. PMI sought an additional $114,932.45 in non-taxable expenses, and the court denied its request.

PMI argues in its cross-appeal that because of the "extraordinary complexity" of the Par 34 transaction, PMI employed four experts to assist its attorneys in preparing for trial. It also retained a litigation graphics firm to prepare charts and exhibits, utilized investigative services, and incurred costs for messenger services, long distance telephone calls, travel, and document binding.

PMI contends that these expenses should also be recoverable as attorney's fees under A.R.S. § 12–341.01(A) because they were necessarily incurred to establish its successful defense to CenTrust's lawsuit. In support of that contention, PMI cites a

number of federal cases as well as the decisions in *Continental Townhouses East Unit One Association v. Brockbank*, 152 Ariz. 537, 733 P.2d 1120 (App.1986), and *Aries v. Palmer Johnson, Inc.*, 153 Ariz. 250, 735 P.2d 1373 (App.1987), that permit recovery of amounts paid for legal assistant and law clerk fees. Although PMI's payments for expert services undoubtedly assisted its attorneys in preparing for trial, those services were not legal services performed under the supervision of an attorney. Therefore, they are not recoverable costs. That is even more the case with regard to its claim for investigative and messenger services, telephone calls, travel expenses, and document binding costs.

Affirmed.

ROLL, P.J., and LIVERMORE, J., concur.